All right, Madam Clerk, if you would please call the case. 324-0604, People of the State of Illinois, Applee v. Jacob M. Bean, Appellant. Is it Killian? Yes. Mr. Killian, if you're ready, you may proceed. Thank you. Mr. Atwood, may it please the court, in this case, the defendant, Jacob Bean, was deprived of a fair trial when the trial court misapplied the standard of knowingly as it relates to causing great bodily harm and causing bodily harm. I think this mistake of law was expounded when the state was incorrectly arguing case law and the standards themselves. In addition, the state failed to prove defendant guilty of both counts one and counts two and failed to rebut beyond a reasonable doubt defendant's assertion of self-defense. And I'll start with count one. Count one, the defendant was charged with aggravated battery knowingly causing great bodily harm, which they would have to the defendant was knew that his push to Mr. Stiesel, the victim in this case, was practically certain to cause him great bodily harm. This was a single stationary push. And I believe there is case law that dates back over a century, back to 1912, with People v. Miguel, then again in Crenshaw, 1921, more recently in People v. Nib and People v. Yemen from 2016. But there's cases, all these cases say that punching a person a single time in the face is not the kind of action that people would expect to cause death or great bodily harm. And even when you go back to the cases over a century ago, the standard was a little bit different, but I think it's analogous to the language we use now, but dangerous or lethal consequences back then, now it's death or great bodily harm. This is accepted case law. It's been around for a long time. It's also good case law because upholding that standard of what knowingly causing great bodily harm is prevents injustices by not punishing people for unintentional or unexpected consequences of their actions. And that's exactly what happened in this case. And I think when you talk about a single stationary push to the chest during a heated argument, I don't see how we can say that that is a more egregious action than taking your fist and punching that same person in the face. I don't believe, even in the light most favorable to the state, that any reasonable trier of fact could say that the defendant knew and that his action was practically certain to bring about great bodily harm. It was an unfortunate, unexpected consequence that happened in this case. Now, last week, it was brought to my attention by Mr. Atwood that after our briefing was done, that a recent Rule 23 case came out of the second district, People v. Hyde, where a defendant was being pinned up against a wall by three police officers, and he pushed against the wall, and a police officer tore his pectoral muscle when he pushed against the wall. And the appellate court in that case, in Rule 23, said, well, in the light most favorable to the state, maybe some rational trier of fact could have found that he was practically certain to cause great bodily harm. It's a Rule 23 case. This court can view that as persuasive authority. I would encourage this court not to because, as I said earlier, I think this is an important case law that is already in place through all the other decisions, and it prevents injustices. I think if we start saying that, well, yeah, if you push back against a wall and somebody tears their pec, that you're practically certain, I mean, it could open up the floodgates and lower the standard for what is traditionally a very high standard and for very good reason. Well, let's say we agree with you as it relates to count one. What about count two? It doesn't require great bodily harm, right? It requires practical certainty as it relates to bodily harm. Absolutely. So I'll move on to count two, definitely a lower standard bodily harm. I would still assert the same principles. And when you take all the totality of these circumstances, when two people are in a heated argument, profanity, face-to-face, if you will, an umpire and a baseball manager, and one person pushes the other, I think that by definition is contact of an insulting or provoking nature. When people are engaged in a heated causes even normal bodily harm. And in this case, there's no evidence that he suffered any normal bodily harm other than the freak accident of what happened to the back of his head. And so I saw in your brief and I got, I mean, there's no suggestion that there's a contusion to the chest or any harm as it relates to the shove itself. But when you shove someone really hard and you're six foot four and 300 pounds, and the other person is five, seven, and one 75 or something like that on a hard concrete surface, I mean, the person's probably going to fall. And when they fall, they're probably going to get hurt when they come into contact with the concrete. Why isn't that with that lower threshold of bodily harm versus great bodily harm, something that's practically certain or more to the point, why isn't it sufficient, given the deference we give to the verdict? Sure. And I think it's, I just want to respectfully point out, you just use the word probably twice. Why am I certain? I don't believe when you push somebody in a heated argument that they are certainly going to fall. That's not a common, you know, even if you were a very confident pusher, you're sort of robbing the meaning of what practically certain is when you say that they're probably going to fall. I mean, even if you're a very confident pusher, you can't say, well, I'm practically certain he's going to fall over. And I think it's also important, I pointed this out in my brief, and I think the state took it the wrong way and said, in terms of the testimony about their size, because it's what you're consciously aware of. And every witness testified that these two people appeared to be about the same size. The two people in the vehicle said that, that they were both tall, that they were both heavy. And the neighbor said that as well. And I'm not saying that they got it right. But when you're talking about conscious awareness, these are two strangers in an argument. And, you know, to impute statistics that were gathered in an autopsy report and say, well, he was consciously aware of that when the other witnesses who were watching it weren't consciously aware of that. I think there's a little bit of a disconnect there. I think it's very important that all the witnesses testified that they appeared to be about the same size that day. Why? I don't know. But they did. And it was unanimous. And I think that's somewhat important. But even so, I would still say that it's not practically certain that someone's going to fall over from a push. Well, are you saying this was overcharged? We're really talking about a battery with unfortunate consequences? Yes. Well, correct. I think the great bodily harm was definitely overcharged. There's no doubt about that. Whether it was overcharged on count two, I don't know that it was overcharged on count two. I think when we got to trial, though, the way the testimony played out, I don't believe they met the standard. And, and I guess, you know, on count two again, count two was a battery of knowingly causing bodily harm on a public way. And, you know, unfortunately for the defendant, he was about, you know, a few feet off of his own private property. But it's indisputable that he was in a roadway. So it was a public way. So that that part meets the legal definition of a public way. But when we're talking about knowingly causing bodily harm, a push to the chest, you know, I don't think it does that. And there's a case that I cited from the second district, People v. Williams, where the second district vacated a domestic battery case where they said, well, he pushed his wife, which again, it gets to by definition, a push is a insulting or provoking contact, but not necessarily you're in common experience, are you expecting someone to suffer bodily harm from a push or a shove? And the way so in your view, it's simple battery? Well, in my view, it's a very strange issue. But the grain, I think what should have been brought was contact of insulting or provoking nature in a public way. I think they if you and I haven't gotten to the self defense issue yet. Well, that's what the grand jury voted a no bill on. Exactly. But you know, they could have went abroad to the court, they could have brought it to the judge in a probable cause here. They could have brought it to a judge in a probable cause hearing, they could have brought it to a different grand jury. But you know, those things have consequences. I mean, they know build that and that's not what he was charged with. But I think that's what the evidence ended up being if if again, you discount the self defense claim. Mr. Killian, your client obviously didn't testify as it was his right.  But the historians, including the videotape, which I think is very important in this case, don't show exactly what happened in those seconds before the push. You said standing. I can't, I can't remember your words exactly. But basically, that they were not in motion whatsoever. That it was just a push, like push off, get away from me push.  But the evidence doesn't clearly show that in any respects, does it? Well, no, no witness testified. I believe all the witnesses testified that they were standing sort of chest to chest and he pushed him. Nobody said that he lunged or ran or anything like that. So I believe that's the only inference you can draw when no witness testified as to anything other than a stationary push. But back to Justice Brennan's comments. If I'm 64300 and I'm pushing 57177, I'm practically certain that that person is going to when I push him. Or at least couldn't the judge find that that he was practically certain? Potentially, but again, that I mean, that gets to my second part of this is the judge misapplied the law as well. And it also it also goes to the self defense issue, which I believe that we put enough evidence out there where the state had to rebut it, and they don't have any witnesses that described what led up to this push. The only witness who saw what led up to this push testified everything that would meet self defense, and the state didn't put on any witnesses who saw anything prior to the push. Thank you. So, yeah, with that, I guess I do want to argue, talk about the self defense issue, because the state chose not to call the one eyewitness who saw a significant amount of this. This is Rania Di Fala. She's the neighbor. She came outside. She testified about the argument that was going back and forth. She testified that they were both using profanity towards each other. She also testified that before the defendant pushed Mr. Steso, that Mr. Steso had raised his towards the defendant. All six factors, I think, are shown. Again, there's not a burden of production even on that, that I understand. There is, you have to put forth some evidence of all six of those factors. And then how does the state rebut that in a case like this? The one witness specifically said, Chase Arthur, who's a young man, I think he was 17 years old at the time. He said, the first thing I saw was him getting pushed to the ground. I didn't see anything before it. I couldn't tell you anything about it. The two witnesses in the vehicle say they were traveling at 20 miles per hour, and they were essentially on top of them when they first noticed them. That is a blink of an eye. And they only saw half of it as well, because they're only looking at my client's face. The other person has the back to them. And we're talking about a blink of an eye, a fraction of a second, and they saw a guy get pushed to the ground. That is not the kind of evidence- What do you mean by push to the ground? There's a push, and then there's push to the ground. Was that one in the same? Well, actually, I think I just misspoke because she actually didn't, the wife testified that she didn't see him get pushed to the ground. She saw him get pushed and didn't see him fall is actually her testimony. The husband said he saw the push, but then looked in his rearview mirror and saw him fall. So there's- Well, that's probably a more than likely reasonable description of the event. Well, I don't think there's- Push to the ground, would you say goes to the intensity of the push more than anything? Well, the one person who saw the entire push was Ronnie DePaola, and she testified that he was pushed and he tripped backwards and fell to the ground. That's the one person who testified of an unbroken chain of what happened. Because the other push to the ground is reasoning backwards. What's that? The other testimony is reasoning backwards. Push to the ground means I probably saw somebody on the ground or whatever, you know.  I don't know. Go ahead. Any other questions for Mr. Justice Hedlund? To both attorneys, you're not aware of it, but we did allow your motion, Mr. Atwood. Mr. Killian, I just want to confirm you did not object. I was told it was an unopposed motion, correct? Correct. Thank you. Mr. Killian, you will have an opportunity in rebuttal. Thank you. Mr. Atwood. Good morning, your honors, counsel. May it please the court. My name is Nicholas Atwood, and I represent the people of the state of Illinois in this matter. I'm going to address the issues in the order they were raised today. The first issue being whether the defendant was proven guilty beyond a reasonable doubt of aggravated battery causing great bodily harm, and the second count on a public way. So the only issue that's being challenged here is whether the defendant acted knowingly. And knowingly has been described as a conscious awareness. Can I interrupt? Do you agree that the trial court completely got the knowingly standard wrong? I think the trial court did a very poor job of trying to define knowingly, but since you've asked, I'll jump straight into that and address that. Of course, the state didn't help matters either. They certainly didn't. But here's the issue with that is this reviewing court, you affirm that court's judgment, not its reasoning. This is subject to a harmless error analysis. And as long as the record affirms the trial court's judgment, this court also affirms, and the record does support this court's judgment. We wouldn't do that with a jury, would we, Mr. Atwood? I'm sorry? We wouldn't do that with a jury, would we? I've tried it and not been successful in the past in this court. So I think oftentimes, no. But the fact that it's a bench trial specifically, that does render it subject to a harmless error analysis. And you can affirm on any basis that's supported by the record. And that jumps straight into this reasonable doubt argument. So we have to show that he's practically certain that this shove, not just a push, it was described as a shove, a brute force, by the way, was practically certain to cause great bodily harm. And we're looking at the entire circumstances. And when we're looking at that, the court knowledge is proven through circumstantial evidence and through inferences. It's very, very rarely proven by direct evidence. So let's look at these circumstances in this case. The defendant performs a three-point turn on a busy residential street. The victim's vehicle approaches his car, slows down nearly to a stop, and chastises the defendant for his negligent turning in that busy street while he's visiting pizza. This causes the defendant to go berserk. He gets out of his vehicle in a rage, screaming obscenities, profanities, threats. He goes 150 feet down the road to accost the victim, who only gets about six to 10 feet out of his vehicle. While they're standing there, they're shouting back and forth. They're insulting. So who got out of the vehicle first? The defendant had to have gotten out of the vehicle first, because he was closing the gap before the victim could have possibly gotten all the way down there. That logic doesn't add up. Maybe the defendant was moving faster than the victim. Well, the victim had to get down the street. The defendant, as I recall from the video, was opening the door before that vehicle was even out of the scene. You are correct. He was out of the car in like a shot. But how do we know what this engagement was? Your client was also yelling obscenities. Old F, I think, several times. Why was he not voluntarily engaging in this? So that's not the standard, voluntarily engaging. Threats or words are not sufficient to trigger a self-defense analysis. Self-defense is to protect people, not pride. And it is undisputed that the victim never laid a hand on the defendant. He never did anything that would cause this defendant to be in fear that he would need to defend himself. There was evidence that he raised his hand, correct? So there was disputed testimony on that. Rania testified that he raised his hand. Both Gerardo and Maria testified that the arms were down to the side. Specifically, Maria said his hands were clenched. So that's an additional detail that I think lends credibility to her statement. Moreover, Gerardo did see this entire event unfold. He was the driver of their vehicle. As he was approaching, he was on the side where the fight or where the incident occurred. As he approached, he would have clearly been paying attention to these individuals who are standing in the middle of this concrete street to avoid perhaps something spilling over in front of him or to avoid hitting them. He watches it. As he approaches, he sees the anger. He sees the rage in the defendant, who he did describe as taller, not as the same size. And obviously, you know, sitting in a vehicle, there's going to be height perception issues here. I'll get to the defendant's awareness of the size later. But as they're approaching through his window, he sees the shove. In his rearview mirror, he sees the fall. These things are happening in one continuous motion. He has seen the entire event. Both he and his wife testified consistently. Rainia never testified in her or never said in the 911 call that the victim had his hand up in the air. And moreover, even as the trial court noted, let's assume his hand or fist was in the air. The defendant is six feet four, 300 pounds. I believe the court said, I'm trying to envision this six foot four, 300 pound, 24 year old man feeling the need to, you know, brutally shove this man on this concrete while he raises his fist at him. I mean, the guy was five feet seven, 177 pounds, 60 years old. In the Nibi case, they talk about size differences. What's a substantial difference in size between the two parties? They say five or six inches and 50 pounds. We have a nine inch difference, a 25 year older victim, and we have 125 pounds in weight differential. What's important to note when we're talking about the defendant's awareness, they were standing face to face. The defendant could not have been unaware that he was nine inches taller than this man when they're standing face to face. That is not a reasonable inference, regardless of the different vantage points of the witnesses. They just clearly were inaccurate in how they were describing the two individuals and the defendant would have been the closest to him. He didn't testify, so we don't know what his conscious awareness was. So therefore, we have to make reasonable inferences based on the facts because he never said, I thought we were the same size. So what's a reasonable inference? I want to get to the shove as Justice Holdridge talked about. This was not a push aside. This was not a push to someone in the back who could have perhaps thrown their arms out and caught themselves. This wasn't someone being shoved lower in their body. He's six feet four. He is shoving with brute force forward, which had to be down if he was hitting the victim high on his chest as the witnesses described. Think about how high that is on your center of gravity. You're standing flat footed. A man that weighs 125 pounds more than you and is nine inches taller than you shoves you with brute, rageful force as we know he was acting such that it lifts you off your feet. Well, I keep hearing brute, brute, brute, brute. Brute force was what that was testified to. It's in the record. It was brute force that was used. I think it was Gerardo that used that phrase. Characteristic, yes. Correct. And then he described it in detail, him and his friends when they were younger, but brute was his word. And so with that force, certainly coming from a downward angle, Gerardo testified when this man fell, he didn't stumble. He didn't trip. He fell straight back. And we hear the evidence of that when his skull cracks that pavement in the video. It's a guttural noise. And so the only reasonable inference, because we don't have video of it, is that this much larger man, much younger, much stronger, shoved with such force high on this man's center of gravity that it took him off his feet such that he had no time to throw his arms down or any other way to mitigate that fall. These are the circumstances of this case. And when we look at all those factors, of course, it was practically certain that this man would suffer a bodily injury, a great bodily injury, which the courts have described as something more than simple battery. So we basically had to show that by doing this action with these individuals on this setting, on a concrete pavement, all we have to show is that some injury more than cuts or bruises was likely to occur. And clearly, that's what happened in this case. So I think- I have a question about the transcript and the testimony. I heard that same noise and suspected but hoped it wasn't what I thought it was. No one, after reviewing the transcript, I didn't find any place where anybody confirmed that that was what the noise came from. It was discussed amongst the parties, as I recall, and it wasn't confirmed. But again, we can use reasonable inferences. And I think it's the only sound that makes sense, given what was described and how the shove transpired and what the facts were. If there was some evidence that he had stumbled or was able to throw his arms down, I would suggest to you that that wouldn't support that level of noise. But I think given the timeline and what happened in the videos and then what happened immediately after that, it's really the only noise that that could be. That's a reasonable inference. But you don't even need to hear the noise to understand, like, when you're looking at the specific facts here of the size, the aggression of the defendant, because cases talk about- I think it was, let's see, the Hyde case. They talked about the fact that the defendant was heavier and that he was acting belligerently. So your mood, the rage, or the berserk nature of this defendant is influencing how much force is going into this shove. And there's no evidence at all that this was a, quote, stationary shove. There's no evidence that anyone was both flat-footed and that he merely pushed him away. He could have taken one step and, with that force, generated enough force to throw this man off of his feet as what seemingly was indicated by Gerardo's testimony. And with that, I want to talk about some of the different cases here, could any rational trier of fact under these circumstances reach that result? We're not going to question the court's credibility determinations or reweigh that evidence because the court was there. They could view Rainey's testimony against Gerardo and Maria and determine who's more credible based on that evidence. But in People v. Hyde, for example, the second district found great bodily harm was practically certain to occur with far less force than was used in this case. Let me ask a question. I'm just focusing for a moment on the judge's complete refusal to accept the correct definition of knowing and her application of her incorrect understanding to the facts. And isn't it at least possible that if she had the correct understanding of knowingly, that she might have concluded it was not practically certain that great bodily harm, for example, would occur from this shove? And if that's a possibility, isn't that a concern from a harmless error standpoint? Well, there's always a concern when addressing an issue like that. That's why we have to look at what are the facts support. And that's why the law says you don't have to rely on her reasoning. You only can look at the judgment. The judgment was a guilty verdict, finding that he was knowingly. So do these facts that were presented to that judge in a challenged setting, represented by attorneys, evidence presented, arguments made, was all of that sufficient to insulate that judge's potential misapplication of knowledge from error? Because those facts so purely show that he was guilty, that he had to have had a practical certainty that this would occur, that he was aware that that would occur. I think one thing that's also telling with the judge, she also spoke about it in the context of almost getting to the level of intent, which is obviously a higher standard than just knowing. It's proving that he intended that specific result. So I think there's at least one line in there where the court was sort of considering this is on the high end of knowledge, not on the low end of knowledge. But again, I can't read the judge's mind on that. I have to apply the law and the facts as they've been given. And that's why I think even if you think she applied the wrong standard, any rational trier fact- Well, we don't think it. She told us she applied the wrong standard. Even if this court makes that conclusion? Well, I mean, is there any other conclusion? Yeah, you must admit that that is the only conclusion, counsel. Well, that's why I'm arguing harmless error. Right, but let's not say even if. She applied the wrong standard. And if I can follow up on Justice Brent, where do I find this in your brief? This argument that even though a judge was applying the wrong law, as long as the facts- Well, Your Honor, I didn't write the brief. The defendant argued that it wasn't harmless error. So I am responding to harmless error with the established case law that you can't affirm on any basis contained in the record. And that's your- You certainly read the brief, right? I did, yes. I'm sure you know it very well. So there's no place in the brief where that argument was made? That particular argument is not directly made. It's probably not appropriate to argue it here. Well, it just addresses the harmless error. So it's the same context, but it's not in the appellee brief. But in the interest of preserving it, should this go to appeal, the argument has been made. Thank you. But I also don't think that that particular argument, you know, it's still based on the facts that have been presented to this court. So with that, one thing I do want to address is just a couple of the cases the defendant cited as being these one-punch cases. This was Nibi and this was Yeoman. These one-punch cases, this is a long-standing rule in Illinois that a punch to the face is not sufficient to put a person on notice that they might be murdering or committing a murder of another person. And that's for obvious reasons. You wouldn't think if you hit a person in the mouth that that's going to kill them. But one shove and one punch are totally different things. And a punch to the back of the head could conceivably kill someone. There have been boxers in the ring that have been killed by a blow to the brain. It just depends on where that's located. So we have to look at these cases individually on their merits and the specific facts of those cases. In Nibi and in Yeoman, you had defendants and victims that were almost the exact same size. There was no substantial age or weight distribution or differences between them. So the court looked at those and said, okay, I wouldn't expect a 160-pound guy punching another 160-pound guy once in the face that that would kill an individual. So I think those are distinguishable. Likewise, the Williams case, when the defendant pushed, it was either his girlfriend or his  There were a lot of problems with that case. The victim was intoxicated. She'd been to a pool party earlier. Her testimony was equivocal. She stated that he did push her, then he didn't. She stated that the injury could have come from having been at a pool party earlier that So the court found that the defendant did not ultimately commit that crime. With regard to self-defense, just briefly, all we have to prove is that if the defendant was the aggressor, self-defense is not available to him. And I think if we look at this case, the only thing the victim ever used were words. Even if he said, come and fight me, which two times he said, I don't want to fight you. Even if he said, come back here and fight me, those words are insufficient to justify the initial use of force that the defendant made. So on that fact alone, self-defense can't be proven. But what about the neighbor and the raised fist? Well, I think the trial court ultimately determined that that wasn't the most credible testimony because she qualified it. She said, look, even if he raised a fist, first of all, we don't know what the context that was. Maybe he raised his hand out or his fist out to stop the defendant from coming towards him. Maybe he raised it like, you'll rue the day that you did this to me. There's no evidence at all that he raised it and was in the motion of punching. A raised fist on its own, I'm not aware of any case law that supports a self-defense on that situation, especially given the size and the age disparities. Thank you, Mr. Atwood. Any questions for Mr. Atwood from Justice Holder-Trahedl? All right, thank you, Mr. Atwood. Mr. Killian. Thank you. I want to point out that the People v. Lovelace case where the trial court instructed the jury improperly, that was an aggravated battery to a peace officer, was not about great bodily harm. It was just regular bodily harm to a peace officer. And in that case, the evidence was that the defendant picked up the officer, body slammed him and broke his collarbone and gave him a head contusion. They didn't say that the evidence was so overwhelming in that case. They said, hey, they got the law wrong here and the jury could have just applied it to his conduct and not the knowing result. I mean, that harmless error review, you don't get all the deference and every single inference towards the state. It's whether it was so overwhelming that even with the correct application, it was obviously proved beyond a reasonable doubt. And, you know, here, that's just not the case. I mean, if this court disagrees with my arguments that, you know, the self-defense wasn't disproved, this case has to go back for a retrial on count two. And I'll just leave aside count one right now. But I don't think there's a good faith argument that if the trial court got count two wrong, or sorry, that the trial court misapplied the law, which it clearly did, that count two doesn't go back for a retrial. Completely deprived of a fair trial. It was obviously, it was a close case. There's the self-defense issues, it's a push. Again, I mean, we can make all these arguments. Well, it was brute force and all this, but those inferences go away once there's a misapplication of the law. We don't look at it in the light most favorable to the prosecution at that point, is my understanding. And I'd be happy to address anything else, but I want to point that out. I think I've been pretty well heard on the issues. Justice Holdred or Justice Hedl, any additional questions? No. Thank you, gentlemen. The court thanks both sides for spirited argument. We will take the matter under advisement and issue a decision in due course. Court is adjourned until the next oral argument. Thank you. Thank you. Thank you.